1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CALCAR, INC., | CASE NO. 06cv2433 DMS (KSC) |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW ON INEQUITABLE CONDUCT** |
| vs. | |
| AMERICAN HONDA MOTOR CO., INC.; HONDA OF AMERICA MANUFACTURING, INC., | |
| Defendants. | |
| AND RELATED COUNTERCLAIM. | |

On November 3, 2008, this Court issued findings of fact and conclusions of law on the issue of inequitable conduct, finding Plaintiff American Calcar, Inc. ("Calcar") committed inequitable conduct during the prosecution of United States Patent Numbers 6,330,497 ("the '497 Patent"), 6,438,465 ("the '465 Patent") and 6,542,795 ("the '795 Patent"). Calcar appealed that decision to the Federal Circuit, and while that appeal was pending, the Federal Circuit decided *Therasense, Inc. v. Becton Dickinson and Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (*en banc*), which modified the standards for inequitable conduct. In light of *Therasense*, the Federal Circuit vacated this Court's finding of inequitable conduct and remanded the case for further proceedings. *See Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*, 651 F.3d 1318 (Fed. Cir. 2011).

/ / /

1    After remand, the parties submitted an additional round of briefs and refined their arguments.

2    Honda now limits its accusations of inequitable conduct to Michael Obradovich, the founder of Calcar,

3    and the parties focus on the specific issues identified by the Federal Circuit, namely whether Mr.

4    Obradovich knew that withheld information was material to his invention and whether he made a

5    deliberate decision to withhold that information.  The matter came on for hearing on March 16, 2012.

6    Robert Maier, Jennifer Tempesta and Richard Clegg appeared on behalf of Calcar, and Robert

7    Hillman, John Johnson, Michael Autuoro and Michael Rosen appeared on behalf of American Honda

8    Motor Co., Inc. and Honda of America Manufacturing, Inc. ("Honda").

9                                      **I.**

10                              **FINDINGS OF FACT**

11   1.      Michael Obradovich is the founder of Calcar.  (Trial Tr. at 251.)

12   2.      In the 1990s, Calcar had an editorial department and an art department.   John Dinkel

13   supervised the editorial department, and Michael Kent assisted Mr. Dinkel.   (Dep. of Michael

14   Obradovich ("Obradovich Dep.") at 9, Nov. 14, 2007.)[1]  Michael Lasting managed the art department,

15   which usually consisted of five or six employees.  Mr. Obradovich and his wife Karen also worked

16   at Calcar.

17   3.      During this time, Calcar developed and sold vehicle booklets that provided information

18   specific to the vehicle and were included by some automobile manufacturers in the glove boxes of

19   their vehicles.   These booklets were called "Quick Tips."   "Quick Tips" were four-by-six inch

20   booklets that included "everything you want to know about your new car in ten seconds or less."

21   (Trial Tr. at 251.)  In essence, "Quick Tips" was a condensed version of the owner's manual.

22   4.      Calcar employees would use the owner's manuals to create "Quick Tips."  Indeed, Calcar's

23   business model was based on copying the owner's manuals and condensing them into "Quick Tips"

24   booklets.   As Mr. Kent stated, employees in the editorial department "would cut out or copy the

25   owner's manual, put the numbers on them, and then write all this stuff out and send it down to [the

---

27   [1] Mr. Obradovich was deposed on six separate occasions during this case and a prior case, *Am.*
28   *Calcar, Inc. v. BMW of N. Am.*, Case Number 04cv0614.  Portions of those deposition transcripts were
     submitted at various times during this case, including at trial.  Rather than refer to the exhibit number,
     the Court will simply refer to the deposition session by date and transcript page number.

1  art department], and they'd do the art, and they'd send it back, and we'd check it."  (Decl. of Robert

2  Maier in Supp. of Opp'n Br. ("Maier Decl."), Ex. 5 at 17.)

3  5.      Calcar employees also took photographs of the vehicles for use in making "Quick Tips."  (*Id.*

4  at 43; Obradovich Dep. at 326, Aug. 30, 2005.)

5  6.      In 1996, Calcar created "Quick Tips" for the Acura RL.  (Obradovich Dep. at 82-83, May 25,

6  2005.)

7  7.      In May of 1996, Honda added the navigation system feature as an option for the Acura RL.

8  (Trial Tr. at 600.)  This was the first in-dash navigation system introduced in North America.  (*Id.* at

9  608.)  The system included a display screen that the user could control either by touch or by using a

10  joystick.  (*Id.* at 620.)  Available options were presented to the user on the display screen, and the

11  display changed according to the status of the option.  Unselected options were presented in one color,

12  selected options were highlighted in yellow, and activated options were highlighted in blue and

13  indicated audibly with a "beep."  (*Id.* at 620-23; 1066-67.)  The system also included an input screen

14  whereby the user could enter information that would cause the system to search for and display

15  information related to the user input.  (*Id.* at 627-29.)

16  8.      During the summer of 1996, someone from Calcar took photographs of the dashboard of an

17  Acura vehicle with a navigation system, including the display screen.  (Decl. of Michael Rosen in

18  Supp. of Opening Br. ("Rosen Decl."), Ex. L.)  Each photograph captures a different display screen.

19  In one of the photographs, the words "Find Calcar" appear in one of the boxes on the display screen.

20  (*Id.*)  Another photograph shows a list of options on the display screen, one of which is highlighted

21  in yellow, along with information about that option in a separate box on the display.  (*Id.*)  The back

22  sides of the photographs are stamped with Kodak insignias, including one that reflects Kodak's status

23  as a sponsor of the Olympic games.[2]

24  9.      In August of 1996, Mr. Dinkel borrowed an Acura RL that was equipped with a navigation

25  system.  (Trial Tr. at 266-67.)  Mr. Dinkel, Mr. Kent and Mr. Obradovich spent between "30 minutes

26  to an hour" in that car, during which they operated the navigation system and drove the automobile.

27  / / /

28  _____

[2]  The 1996 Summer Olympics were held in Atlanta, Georgia.

1    (*Id.* at 266-68.)   That experience led to the conception of the inventions at issue in this case.

2    (Obradovich Dep. at 237, May 26, 2005.)

3    10.      The following month, September 1996, Mr. Obradovich contacted a patent attorney, Alex Yip.

4    (Obradovich Dep. at 285, Aug. 30, 2005.)

5    11.      A few months later, on November 15, 1996, Mr. Dinkel wrote to Jack Yamuguchi regarding

6    navigation systems.  Mr. Yamaguchi had authored an article entitled, "Honda in-car navigation system

7    for the U.S.," that was published in the June 1996 edition of Automotive Engineering magazine.

8    (Rosen Decl., Ex. N.)  In his letter to Mr. Yamaguchi, Mr. Dinkel stated:

9            Right now I'm in the process of gathering information on vehicle on-board navigation
         systems like the one in the Acura RL.  Realizing that Japan is the home of such
10           systems, I was wondering if you could direct me to any sources of information on the
         newest systems.  Have you written any articles for the SAE on the subject?  I have
11           copies of all current and back issues of Automotive Engineering, but I can't remember
         any extensive articles.

12

13   (*Id.*)

14   12.      Mr. Obradovich worked closely and exclusively with Mr. Yip on the patent application.

15   (Obradovich Dep. at 351, Aug. 30, 2005.)  Although Messrs. Dinkel and Kent are named as inventors

16   on the patents at issue, neither was involved in preparing the patent application.  (*Id.*; Decl. of Michael

17   Rosen in Supp. of Reply Br. ("Rosen Reply Decl."), Ex. AB at 28-30; Rosen Reply Decl., Ex. AA at

18   57.)

19   13.      Rather, Mr. Obradovich drafted the application and gave it to Mr. Yip.  (Obradovich Dep. at

20   282, 285-86, Aug. 30, 2005; Obradovich Dep. at 26, February 13, 2008.)

21   14.      Mr. Obradovich also participated in preparing the drawings that were part of the patent

22   application.  (Obradovich Dep. at 302-06, Aug. 30, 2005.)

23   15.      The application includes two explicit references to the navigation system of the 1996 Acura

24   RL ("the 96RL").  First, it states in the section entitled "Background of the Invention:"

25           Recently navigation systems based on military global positioning system (GPS)
         technology have emerged.  One such navigation system is commercially available as
26           an option for the latest model of the ACURA 3.5 RL automobile.  This ACURA
         navigation system receives signals from a constellation of satellites which is part of the
27           GPS.  In response to these signals, the navigation system pinpoints the automobile's
         location (in latitude and longitude).  It also detects the automobile's speed and
28           direction. With geographic information stored on a hard disk in an onboard computer,

1   the navigation system is capable of verbally and visually communicating to the user
2   instructions for reaching the destination.

3   16.    The evidence indicates the source of this information is the 96RL navigation system manual

4   ("the Manual"), given the similarities between the Manual and the application.  For instance, the

5   application states, "This ACURA navigation system receives signals from a constellation of satellites

6   which is part of the GPS.  In response to these signals, the navigation system pinpoints the

7   automobile's location (in latitude and longitude)," whereas the Manual states: "The Navigation

8   System receives signals from the Global Positioning System, a network of 24 satellites in orbit around

9   the earth.  By receiving signals from several of these satellites, the Navigation System can determine

10  the latitude and longitude of your vehicle."   Other similarities between the application and the

11  navigation system manual include:

| Application | Manual |
|---|---|
| "It also detects the automobile's speed and direction." | "In addition, a gyroscopic sensor and a speed sensor in your vehicle keep track of the direction and speed of travel at all times...." |
| "With geographic information stored on a hard disk in an onboard computer, the navigation system is capable of verbally and visually communicating to the user instructions for reaching the destination." | "As you drive, the Navigation System provides visual and audio driving instructions so you do not have to take your eyes off the road." |

18  17.    The second explicit reference to the 96RL navigation system in the patent application is in the

19  section entitled "Detailed Description:"

20          Display interfaces 102 include, inter alia, AUTO DIRECTOR display interface 102a,
21          which is illustrated in Fig. 2, together with control panel 205 in Fig. 1.  By way of
            example, but not limitation, the hardware of interface 102a and control panel 205 are
22          derived from a prior art navigation system of the type of the ACURA navigation
            system.

23  18.    Several of the drawings in the patent application are identical, in all relevant respects, to

24  figures in the Manual.  As stated above, the application admits Figure 2 is "derived from a prior art

25  navigation system of the type of the ACURA navigation system."  (*See also* Trial Tr. at 272) (Mr.

26  Obradovich stating Figure 2 "is the depiction of the Acura navigation faceplate.")  Figure 2, which

27  "looks like something [Mr. Obradovich] prepared[,]" (Obradovich Dep. at 304, Aug. 30, 2005), is as

28  follows:



Fig. 2

It appears to be derived from the following figure from the Manual:

19.    Figure 9 of the patent application, which depicts the "Quick Tips Set-Up" screen, also appears
to be based on a figure from the Manual.  These two figures are displayed below:

/ / /

/ / /

/ / /

/ / /

/ / /





20.      Figures 17 and 18 of the patent application, which go directly to the inventions described in the '465 and '795 patents, also appear to be based on figures from the Manual.  Specifically, Figure 17 depicts a data entry screen wherein the user can enter "the name of the item of interest or its beginning letter."



This screen is similar to a display screen in the Manual wherein the user can enter the name of a destination city:



1 After the user enters an item into the data entry screen, an index screen appears on the display, "with
2 the search name ... highlighted yellow."

3

4

5

6

7

8

9

10

11



12 This figure is similar to a display screen in the Manual, wherein a list of cities are displayed according
13 to the user's entry on the previously described screen, and from which the user can make a selection
14 by highlighting the entry in yellow:

15

16

17

18

19

20

21

22 21.     Other figures in the patent application contain language similar to that found in "Quick Tips"
23 for the Acura RL.  For instance, Figure 6 of the patent application, which was generated by Mr.
24 Obradovich, (Obradovich Dep. at 304, Aug. 30, 2005), is as follows:

25 / / /

26 / / /

27 / / /

28 / / /

1
2
3
4
5
6
7
8
9
10



The language in this Figure is nearly identical to language in the "Quick Tips" for the Acura RL.  (*See* Rosen Decl., Ex. B at 26) ("This booklet has been prepared to help you get acquainted with your new *Acura*, and to provide a convenient reference source for common questions.  **However, it is not intended as a substitute for your Owner's Manual**.") (italics added).  The same may be said about Figure 7, which is depicted below:

(*Compare* Figure 7 *with* Rosen Decl., Ex. B at 26) ("Your *Acura* is equipped with many safety features, including air bags for both the drive and front-seat passenger.  Air bags do not replace your seat belts.  They supplement, or add to, the protection offered by seat belts.") (emphasis added).

22.     In both of these Figures, some typographical information was deleted and replaced with handwritten information.   Specifically, the typewritten word "Acura" was replaced with the handwritten word "car."   When asked about these edits, Mr. Obradovich stated: "... there was a lot of copying and copy on top of it, cutting and pasting."   (Obradovich Dep. at 305, Aug. 30, 2005.)

23.     Based on the language of the patent application, the drawings in the patent application, Calcar's "gathering [of] information" on the 96RL navigation system and Calcar's practice of copying vehicle manuals to create "Quick Tips," the overwhelming evidence indicates Mr. Obradovich used the 96RL navigation system manual while working on the patent application.

24.     Despite the similarities between the operation of the 96RL navigation system and the inventions described in the patent application, and despite the 96RL navigation system being "a good base platform.  A good base to get started [ ]" on the inventions at issue in this case, (Trial Tr. at 266), Mr. Obradovich did not "detail any aspects of the user interaction of the 96RL system [ ]" to the Patent and Trademark Office ("PTO").  *Calcar*, 651 F.3d at 1328-29.  "Specifically, the inventors never disclosed to the PTO the aspects of the 96RL system relating to the three-status feature or the search feature."  *Id.* at 1329.

25.     While Mr. Obradovich was working on the patent application, he was also working on another project, which was originally called "Talking Quick Tips."  (Trial Tr. at 273-74; Maier Decl., Ex. 3 at 37.)  The aim of this project was to create a demo for presentation to Honda with the hope that Honda would incorporate "Talking Quick Tips" into its Acura RL navigation system.

26.     To assist with the creation of the demo, Mr. Obradovich hired Edward Rajchel.  Mr. Rajchel created the demo and delivered it to Calcar in late November or early December 1996.  (Maier Decl., Ex. 3 at 37.)  In January 1997, Calcar contacted Mr. Rajchel about making enhancements to the demo, and informed him they were changing the demo from "Talking Quick Tips" to "Auto Director."  (*Id.*)

27.     The patent application repeatedly refers to the system described therein as "AUTO DIRECTOR."

28.     During the implementation of these enhancements, Mr. Rajchel took two "test drives" in an Acura RL with a navigation system.  (*Id.* at 80-81.)  Mr. Dinkel drove the car during those "test

/ / /

1    drives."  Mr. Rajchel, Mr. Kent and another person from Calcar were passengers during those "test
2    drives."

3    29.    On January 28, 1997, Mr. Yip filed the application that resulted in issuance of United States
4    Patent Number 6,009,355 ("the '355 Patent").

5    30.    Along with the application, Mr. Yip submitted a Combined Declaration and Power of Attorney
6    form signed by Mr. Obradovich.  That form states, *inter alia*: "I acknowledge the duty to disclose all
7    information known to me which is material to patentability as defined in Title 37, Code of Federal
8    Regulations, 1.56."

9    31.    The '355 Patent issued on December 28, 1999.  Generally, it is directed to a system for use in
10   automobiles that allows the user to access information about automobile functions through a display
11   screen and an interface.

12   32.    On November 21, 2000, Mr. Yip filed a continuation application of the '355 Patent.  That
13   application resulted in the issuance of the '497 Patent on December 11, 2001.  The '497 Patent claims
14   a system in which options are displayed to the user, and the display changes depending upon the status
15   of the option.  Unselected options are displayed in a first status, selected options are displayed in a
16   second status, and activated options are displayed in a third status.  In the preferred embodiment of
17   the invention, the selected option "is highlighted in a first color, for example, yellow." ('497 Patent,
18   col. 3, lines 58-60.)  "The activated option is highlighted in a second color, e.g., blue, to indicate its
19   active status."  (*Id.* at lines 64-66.)

20   33.    Mr. Yip filed another continuation application on February 23, 2001.  That application resulted
21   in the issuance of the '465 Patent on August 20, 2002.  The '465 Patent claims a system in which the
22   user may enter "a query to conduct a search concerning an aspect of the vehicle" through the use of
23   an interface.

24   34.    On June 20, 2002, the inventors filed another continuation application, which resulted in the
25   issuance of the '795 Patent on April 1, 2003.  Like the '465 Patent, the '795 Patent claims a system
26   in which the user may enter a request for information concerning an aspect of the vehicle, which
27   request includes a user description of the vehicle aspect.
28   / / /

1   35.      BMW initiated reexamination proceedings on the '355 Patent and the '497 Patent.  In the '497

2   proceedings, Calcar submitted a copy of the Manual and Honda's preliminary invalidity contentions

3   from this case ("PICs") to the PTO.  On June 11, 2008, the PTO issued a Notice of Intent to Issue Ex

4   Parte Reexamination Certificate on the '497 Patent, confirming claims 1 through 29.   Claims 30

5   through 56 were canceled.

6                                                    **II.**

7                                      **CONCLUSIONS OF LAW**

8   1.      As mentioned above, during the pendency of this case, the Federal Circuit revisited the

9   doctrine of inequitable conduct.  *See Therasense*, 649 F.3d 1276.  In *Therasense*, the court laid out the

10  origins of the doctrine, which involved cases that "dealt with particularly egregious misconduct,

11  including perjury, the manufacture of false evidence, and the suppression of evidence."  *Id.* at 1287.

12  The court followed the evolution of the doctrine away from that narrow class of cases to cases

13  involving "a broader scope of misconduct, including not only egregious affirmative acts of misconduct

14  intended to deceive both the PTO and the courts, but also the mere nondisclosure of information to

15  the PTO."  *Id.*  The court also noted the expansion of the remedy to "unenforceability of the entire

16  patent rather than mere dismissal of the instant suit."  *Id.*

17  2.      With this evolution of the doctrine, "inequitable conduct came to require a finding of both

18  intent to deceive and materiality[,]" the standards for which "have fluctuated over time."  *Id.*  At one

19  point, the court "espoused low standards for meeting the intent requirement, finding it satisfied based

20  on gross negligence, or even negligence."  *Id.* at 1287-88.  The court "also previously adopted a broad

21  view of materiality, using a 'reasonable examiner' standard based on the PTO's 1977 amendment to

22  Rule 56."  *Id.* at 1288.  The court explained it "embraced these reduced standards for intent and

23  materiality to foster full disclosure to the PTO."  *Id.*  The court noted, however, that the focus on full

24  disclosure "had numerous unforeseen and unintended consequences.  Most prominently, inequitable

25  conduct has become a significant litigation strategy[,]" which "expands discovery into corporate

26  practices before patent filing and disqualifies the prosecuting attorney from the patentee's litigation

27  team."  *Id.*  It also "discourages settlement and deflects attention from the merits of validity and

28  infringement issues[,]" and "'increas[e][s] the complexity, duration and cost of patent infringement

1  litigation that is already notorious for its complexity and high cost.'" *Id.* (quoting Br. and Appendix

2  of Am. Bar Ass'n as Amicus Curiae at 9).  In essence, the court described inequitable conduct as "the

3  'atomic bomb' of patent law[,]" not only for its effects on litigation, but also because a finding of

4  inequitable conduct "regarding any single claim renders the entire patent unenforceable[,]" *id.* (citing

5  *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 877 (Fed. Cir. 1988)), and "can

6  spread from a single patent to render unenforceable other related patents and applications in the same

7  technology family." *Id.*

8  3.      In light of these "far-reaching consequences," the *Therasense* court "tighten[ed] the standards

9  for finding both intent and materiality in order to redirect a doctrine that has been overused to the

10  detriment of the public." *Id.* at 1290.  Under these new standards, "the accused infringer must prove

11  that the patentee acted with the specific intent to deceive the PTO." *Id.* (citing *Star Scientific Inc. v.*

12  *R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)).  Gross negligence and negligence

13  no longer suffice.  *Id.*  Furthermore,

14      to meet the clear and convincing evidence standard, the specific intent to deceive must
        be "the single most reasonable inference able to be drawn from the evidence."  Indeed,
15      the evidence "must be sufficient to *require* a finding of deceitful intent in the light of
        all the circumstances."  Hence, when there are multiple reasonable inferences that may
16      be drawn, intent to deceive cannot be found.

17  *Id.* at 1290-91 (citations omitted).  With respect to materiality, the court adjusted that standard to one

18  of:

19      but-for materiality.  When an applicant fails to disclose prior art to the PTO, that prior
        art is but-for material if the PTO would not have allowed a claim had it been aware of
20      the undisclosed prior art.  Hence, in assessing the materiality of a withheld reference,
        the court must determine whether the PTO would have allowed the claim if it had been
21      aware of the undisclosed reference.  In making this patentability determination, the
        court should apply the preponderance of the evidence standard and give claims their
22      broadest reasonable construction.

23  *Id.* at 1291-92.  In addition, the court made it clear that "[i]ntent and materiality are separate

24  requirements." *Id.* at 1290 (citing *Hoffman-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1359

25  (Fed. Cir. 2003)).  Thus, district courts should no longer "use a 'sliding scale where a weak showing

26  of intent may be found sufficient based on a strong showing of materiality, and vice versa." *Id.*

27  4.      In this case, Honda asserts Mr. Obradovich committed inequitable conduct by failing to

28  disclose to the PTO the operational details of the 96RL navigation system.  As it relates to the '497

1   Patent, those details include the "three status preview" function of the navigation system. With

2   respect to the '465 and '795 Patents, those details include the index and searching functions of the

3   navigation system.

4   5.      For the reasons set out in the Court's previous order on inequitable conduct and in the Federal

5   Circuit's opinion in this case, the Court finds the operational details of the 96RL navigation system

6   are material to the '497 Patent.

7   6.      With respect to the index and searching functions of the 96RL navigation system, which Honda

8   contends are material to the '465 and '795 Patents, Honda witness David Speck testified about those

9   functions at the trial.  According to Mr. Speck, those functions involve a keyboard input screen

10  through which the user can enter letters or words that prompt the system to conduct a search. (Trial

11  Tr. at 627.)  After entering a search term or letters, the user can press the "Find" key to return a list

12  of search results.  (*Id.* at 628.)  The user can then make a selection from that list.

13  7.      This function is substantially similar to the system described in the '465 and '795 Patents.

14  That system includes an interface for entering a query to conduct a search, an input device for

15  selecting a result of the search, a processor that identifies a display associated with the selection, and

16  an element that allows that display to be shown to the user.

17  8.      Calcar does not dispute the similarities between these aspects of the 96RL navigation system

18  and the '465 and '795 Patents.  Instead, it argues the 96RL navigation system is cumulative to two

19  references cited in the Patents, specifically U.S. Patent No. 4,811,240 issued to Ballou, *et al.* and U.S.

20  Patent No. 4,827,520 issued to Zeinstra.  For the reasons set out in the Court's previous order on

21  inequitable conduct and in the Federal Circuit's opinion in this case, the Court rejects Calcar's

22  argument that the 96RL navigation system is cumulative to these references.

23  9.      Rather, the Court finds the PTO would not have granted the '465 and '795 Patents but for

24  Calcar's failure to disclose the operational details of the 96RL navigation system.  As Honda points

25  out, and Calcar concedes, the only difference between the 96RL navigation system and the inventions

26  described in the '465 and '795 Patents is the nature of the information contained in the systems.  In

27  the 96RL navigation system the information concerns navigational details, *i.e.*, destinations, addresses

28  and directions, whereas the system described in the '465 and '795 Patents concerns information about

the vehicle itself, *e.g.*, air conditioning or anti-lock brakes. Mr. Obradovich stated the 96RL navigation system was the "platform" for his inventions, and he tasked himself and his company with preparing a demo of his inventions with the specific hope that Honda would incorporate those ideas into the 96RL navigation system. Calcar described this as an improvement over the 96RL navigation system, but the only apparent improvement was the inclusion of different information. The systems themselves performed the same function, *i.e.*, delivery of information, in the same way, *i.e.*, through an interactive display screen, to achieve the same result, namely providing information to the vehicle user. Under these circumstances, it would have been obvious to a person of ordinary skill in the art to include different information in the 96RL navigation system, and the PTO would not have allowed the '465 and '795 Patents to issue. Thus, the 96RL navigation system was material to the patentability of the inventions described in the '465 and '795 Patents.

10.      Having found these details material, the Court turns to the second prong of inequitable conduct: Intent to deceive the PTO. "While deceptive intent can be inferred from indirect and circumstantial evidence, that 'inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard.'" *Calcar*, 651 F.3d at 1334 (quoting *Star Scientific*, 537 F.3d at 1366). In a case like this, "involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference.'" *Id.* (quoting *Therasense*, 649 F.3d at 1289).

11.      In this case, there is no direct evidence of intent to deceive the PTO. However, as stated above, there is no requirement that intent be shown by direct evidence. Indeed, the Federal Circuit has repeatedly recognized that "deceptive intent can be inferred from indirect and circumstantial evidence." *Id.*

12.      In this case, the circumstantial evidence weighs overwhelmingly in favor of a finding of intent to deceive. Mr. Obradovich knew the operational details of the 96RL navigation system were material to his inventions. He explicitly cited the 96RL navigation system in his patent application, and he based figures in the patent application on figures from the 96RL navigation system manual. He took a "test drive" in a 96RL with a navigation system and saw how it worked. He went so far as to admit

1    that his personal experience with the 96RL with the navigation system led to his conception of the

2    inventions, and that the navigation system of the 96RL was "a good base platform. A good base to

3    get started." His employees took multiple "test drives" in a 96RL with a navigation system, took

4    photographs of the display screen of the navigation system, and one of his employees, Mr. Dinkel,

5    wrote a letter seeking information "on vehicle on-board navigation systems like the one in the Acura

6    RL." Finally, Mr. Obradovich tasked himself and his company with preparing a demo of his

7    inventions with the hope that Honda would incorporate his ideas into the 96RL navigation system.

8    The only reasonable inference from this evidence is Mr. Obradovich knew the navigation system of

9    the 96RL was material to his inventions.

10   13.     Calcar argues Mr. Obradovich did not think the operational details of the 96RL navigation

11   system were material to his inventions because he "viewed his invention as something different and

12   distinct from what was in the 96RL or other known navigation systems." (Opp'n Br. at 14.) In other

13   words, Mr. Obradovich believed the 96RL navigation system was immaterial to his inventions because

14   it involved navigation information as opposed to information about aspects of the vehicle. This

15   argument, however, misses the point. The type of information included in the system is immaterial.

16   Rather, how the user accesses the information, how the information is presented to the user, and how

17   the system works is critical. On these key points, Calcar offers no argument or evidence to support

18   an inference, much less a finding, that Mr. Obradovich was unaware that these aspects of the 96RL

19   navigation system were material to his inventions. On the contrary, the evidence leads to the opposite

20   conclusion, that is, that Mr. Obradovich knew the 96RL navigation system was material.

21   14.     This leads to the question of whether Mr. Obradovich made a deliberate decision to withhold

22   the operational details of the 96RL navigation system from the PTO. Honda argues he did, and it

23   relies on the following evidence: Honda points out that Mr. Obradovich was constantly feeding

24   information to Mr. Yip, but Mr. Obradovich never gave Mr. Yip any information about the operational

25   details of the 96RL navigation system. In Mr. Obradovich's own words, he "was simply furnishing

26   waves of information to Alex Yip," (Obradovich Dep. at 307, Aug. 30, 2005), but he never provided

27   information about the operational details of the 96RL navigation system. Indeed, Mr. Obradovich

28   never told Mr. Yip about his personal experience with the 96RL navigation system, failed to provide

Mr. Yip with a copy of the 96RL navigation system manual, and failed to provide Mr. Yip with the photos of the 96RL navigation system display screens.[3]   The only reasonable inference that may be drawn from these facts is that Mr. Obradovich made a deliberate decision to withhold that information from Mr. Yip and the PTO.

15.     Calcar argues it is equally reasonable to infer that Mr. Obradovich was simply negligent in failing to provide the operational details of the 96RL navigation system to the PTO.  In support of this argument, Calcar relies on Mr. Obradovich's inexperience with the patent system prior to filing the application for the patents at issue in this case.  However, one need not have experience with the PTO to understand that divulging the source of one's "innovation," when that source is the product of another, will derail the patent application.

16.     Furthermore, Calcar's suggestion of negligence, or even gross negligence, implies that Mr. Obradovich simply made a mistake in failing to provide the operational details of the 96RL navigation system to the PTO, or that the failure to disclose was an accident.  *See Kingsdown*, 863 F.2d at 876 (discussing gross negligence).  Yet, Mr. Obradovich disclosed the existence of the 96RL navigation system, and admitted that one of the figures in the application was "derived" from that system.  That he disclosed some information about the system and withheld other information demonstrates a deliberative process, not an accident or a mistake.

17.     Mr. Obradovich's interactions with Mr. Yip also refute an inference of negligence or gross negligence.  As Mr. Obradovich stated, he would "produce things in waves.  I would send it to Alex in waves.  Before he could respond, I would have another wave at him.  So this back and forth didn't exist.  It became just stuff coming at Alex." (Obradovich Dep. at 287, Aug. 30, 2005.)  This evidence

---

[3] Calcar asserts Mr. Obradovich did not take the photos, and suggests he was unaware of the photos until he found them in a filing cabinet in the Calcar office.  The Court is unable to determine who took the photos, but there is no dispute they were taken by a Calcar employee.  And, although Mr. Obradovich disclaims any knowledge of the photos prior to their discovery in the file cabinet, the Court finds that position incredible.   The evidence reflects Calcar employees routinely took photographs of the vehicles for which they were preparing "Quick Tips," and used those photographs in the creative process for "Quick Tips."  That was Calcar's *modus operandi*.   Mr. Obradovich's alleged ignorance about how his company performed its work is contrary to common sense, refuted by the evidence and is belied by Calcar's business model.  (*See* Maier Decl., Ex. 3 at 38) (stating Mr. Obradovich had the final say so on the Auto Director project); (Rosen Reply Decl., Ex. 3 at 31) ("Well, I know that Mr. Obradovich was always - come in and, okay, do this, do this, do that.")  Thus, although Mr. Obradovich may not have taken the pictures himself, it is reasonable to infer he was aware of them while he was drafting the patent application.

1    reflects Mr. Obradovich had ample time and opportunity to provide the information to Mr. Yip, and

2    he took advantage of both to send "waves" of information, but he never sent the operational details

3    of the 96RL navigation system.  In light of these circumstances, it is not reasonable to infer either

4    negligence or gross negligence.  The only reasonable inference, and the one that is required by these

5    facts, is that Mr. Obradovich made a deliberate decision to withhold this information from the PTO.

6    18.    Although this evidence provides a sufficient basis for the Court to infer specific intent to

7    deceive, the Court cannot make that ultimate finding without also considering evidence of Mr.

8    Obradovich's good faith.  *See Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d

9    1380, 1384 (Fed. Cir. 1998) (stating court must weigh all evidence in examining intent to deceive).

10   In this case, that evidence consists of Calcar's commission of a prior art search, and its submission

11   of the 96RL navigation manual and Honda's PICs to the PTO during reexamination of the '497 Patent.

12   19.    There is no dispute Calcar commissioned a prior art search before it filed the '355 Patent

13   application.  This conduct can be evidence of good faith.  *See Milliken & Co. v. Mohawk Industries,*

14   *Inc.*, 335 F.Supp.2d 712, 723 (D.S.C. 2004).  In this case, however, the prior art search does not rebut

15   or address any of the facts surrounding the 96RL.  Indeed, it acts as more of a red herring than an

16   affirmative showing of good faith.  Despite the prior art search, which resulted primarily in disclosure

17   of United States patents to the PTO, Mr. Obradovich did not tell Mr. Yip about his experience with

18   the 96RL, nor did he provide Mr. Yip with the Manual or the photos of the navigation system display

19   screens.  In view of these circumstances, the prior art search commissioned by Calcar holds little, if

20   any, weight on the issue of good faith.

21   20.    The only other evidence of good faith is Calcar's submission of Honda's PICs and the Manual

22   to the PTO during the reexamination of the '497 Patent.  This evidence is more indicative of good

23   faith than the prior art search, but it neither overcomes the other evidence of deceptive intent nor

24   creates a reasonable inference of negligence or gross negligence.

25          Neither Honda's PICs nor the Manual provided a complete picture of the functionality of the

26   96RL navigation system.  Specifically, neither the PICs nor the Manual depicted either the depression

27   of an activated option, or the beep that occurred upon activation of the option, either of which could

28   correspond to the "third status" claimed in the '497 Patent.  In other words, neither of these references

1  provided the PTO with all of the relevant details about the 96RL navigation system.  Thus, this

2  evidence does not negate the other evidence and the inferences to be drawn therefrom.

3  21.     The evidence in this case leads the Court to conclude that Mr. Obradovich acted with intent

4  to deceive the PTO.  This finding, combined with the Court's finding of materiality, lead the Court

5  to conclude the '497, '465 and '795 Patents are unenforceable due to inequitable conduct.

6                                          **III.**

7                          **CONCLUSION AND ORDER**

8           Based on the foregoing findings of fact and conclusions of law, the Court holds the '497

9  Patent,

10  the '465 Patent and the '795 Patent are unenforceable as a result of inequitable conduct.

11          **IT IS SO ORDERED**.

12  DATED:  April 17, 2012

13  _____

14                              HON. DANA M. SABRAW
                                United States District Judge

- 19 -